**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Belle Mere Properties, LLC, | ) | Case No.: 12-70782-BGC-11 |
| | ) | |
| Debtor. | ) | |
| | | |
| Belle Mere Properties, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | A. P. No.: 12-70018 |
| | ) | |
| CBS Properties, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion**
**on the Defendant's Verified Complaint**
**for Declaratory Judgments and Damages**

## I. Summary

Dream, Inc, a non-profit Alabama charity operates a bingo hall on property it subleases from a Texas LLC which leases it from the plaintiff. Around June 1, 2011, about 60 days after the plaintiff purchased the property from the defendant, Dream, Inc.'s bingo hall Frontier Bingo was raided by representatives of the State of Alabama and closed. Frontier later reopened, but more recently has again closed. The pending action relates to the many disagreements arising between the parties shortly after the property purchase.

## II. Background

The plaintiff purchased real estate from the defendant on April 1, 2011, and gave the defendant a mortgage as security for that purchase. Shortly thereafter, the parties disagreed on a number of issues which lead them to state court where the plaintiff had filed a Verified Complaint against the defendant in the Circuit Court of Greene County Alabama.

The state court <u>Verified Complaint</u> was removed to this Court on June 15, 2012, (A.P. Docket No. 1) after the plaintiff filed the pending Chapter 11 bankruptcy petition on April 17, 2012. Case Docket No. 1.[1]

After the complaint was removed, a trial was held in this Court on November 21 and 22, 2013. Appearing were: Herbert M. Newell, III and Mark Scogin, the attorneys for Belle Mere Properties, LLC; Joseph Bulgarella, for the Bankruptcy Administrator; Kristofor Sodergren, Suzanne Mills, and Bobby Cockrell, the attorneys for CBS Properties, LLC; and the witnesses listed below. The issues described below were submitted on the records in this case and the pending adversary proceeding, numerous admitted exhibits, arguments and briefs of counsel, and the testimony of Ms. Che Williamson, the plaintiff's sole member; Mr. Bernard Gomez, the plaintiff's manager; Ms. J.C. McCulley, an employee of Dream, Inc; Mr. William Snipes, a representative of the Alabama Department of Transportation; Mr. Joseph Nelson, a surveyor; Mr. Beverly Spencer, the defendant's sole member; Mr. Lawrence Fair, a water contractor; Ms. Stephanie Pendley, a paralegal with the defendant's foreclosure attorney; and Mr. Lewis Carnes, a representative of the plaintiff's insurance carrier.

On March 27, 2014, the plaintiff filed a <u>Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing</u> for the purpose of satisfying its obligation to make an April 1, 2014, balloon payment required by the parties' Real Estate Mortgage Note and to cure some unpaid mortgage and insurance premium payments. Case Docket No. 166.

On March 31, 2014, the defendant filed an <u>Objection to Debtor's Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364</u>, Case Docket No. 169, contending that the amount offered to cure, including the balloon payment amount, was insufficient. The Court heard arguments on these latest pleadings on April 3, 2014. Because they are directly related to the matters heard at trial, the Court has considered them in the instant memorandum and order.

---

[1] The defendant first removed the complaint to the United States District Court for the Northern District of Alabama on December 9, 2011. District Court Judge Scott Coogler remanded the case to the state circuit court on December 9, 2012. <u>Belle Mere Properties, LLC v. CBS Properties, LLC</u>, Case No. 7:11-cv-04144-LSC (N.D.Ala. Jan. 9, 2012) Docket No. 5.

2

### III.  The Removed <u>Verified Complaint</u>[2]

### A.  Issues

The parties agree that only Counts One, Three, and Five of the removed complaint are before this Court. Counts Two and Four were dismissed by agreement.[3] Each remaining count is quoted below.

### 1.  Count One - Mortgage Payments

6.  Count One reasserts the allegations in paragraphs one through five as if fully stated herein.

7.  The Note calls for payments to be made by Plaintiff in the amount of $9,989.72, beginning April 1, 2011, to Defendant at 144 B&V Drive, Knoxville, Alabama, 35469.

8.  The Note further gives the Plaintiff 30 days within which to make the payment before a late charge is assessed.  If the payment is in default, the Note requires the Defendant, or Note Holder, to provide Plaintiff with written notice of the default.

9.  Plaintiff made an initial down payment on April 1, 2011, in the amount of $214,435.22, comprising a $200,00.00 [sic] down payment, $1,945.50 pro-rata taxes, and $9,989.72 1st monthly payment and other costs; and thereafter made the monthly payments as required by the Note.  A copy of the initial payment check is attached hereto as Exhibit "D".

10.  Plaintiff tendered, and Defendant accepted, the monthly payments for April and May, 2011, without incident.  Defendant then accepted the June payment in July, and the July payment in August.  Thereafter, Defendant refused to accept further payments, even though the payments were tendered by Plaintiff.

---

[2] The only copy of the <u>Verified Complaint</u> before this Court is within a copy of the state court pleadings submitted to this Court on November 16, 2011. See Exhibit 2 to the <u>Report to Court Regarding Submission of State Court Pleadings</u>, A.P. Docket No. 2 and the [Amended] <u>Report to Court Regarding Submission of State Court Pleadings</u>, A.P. Docket No. 4. The <u>Notice of Removal</u> (A.P. Docket No. 1) filed with this Court on June 15, 2012, did not include a copy of the removed complaint.

[3] On October 10, 2012, this Court granted the parties <u>Joint Stipulation For Release Of Temporary Restraining Order & Dismissal of Counts 2 & 4 of Verified Complaint</u>. A.P. Docket No 24. The temporary restraining order was one entered by the state court before the complaint was removed to this Court. Counts Two and Four related to that injunction.

3

11.     Plaintiff has attempted to provide Defendant with timely payments for the months of August, September and October, 2011, by certified checks. Copies of checks for August and October are attached hereto as Exhibit "E".

12.     Defendant has refused to accept payments, however, has filed to provide any notice whatsoever to Plaintiff alleging any default under the provisions of the mortgage.

13.     Despite Defendant's failure to notify Plaintiff of a default, Defendant has undertaken steps to foreclose upon the Mortgage, and had planned upon a foreclosure for Tuesday, November 15, 2011. Defendant even circulated notices to creditors of Plaintiff advising them of the planned foreclosure. A copy of the Notice of Foreclosure is attached hereto as Exhibit "F".

14.     Due to a claimed failure of the local newspaper to run the foreclosure notice as required by the Mortgage and Alabama law, the foreclosure on November 15th was cancelled; however, Defendant still plans to foreclose on the Mortgage, and has tentatively scheduled December 9th as the date of foreclosure.

15.     The actions of the Defendant show a clear intent to manufacture a default in the Note so as to enable Defendant to foreclosure on the Mortgage, unduly enriching the Defendant with the improvements made by the Plaintiff and the value of the Plaintiff's business operations associated with the property.

Verified Complaint, Exhibit 2 to Report to Court Regarding Submission of State Court Pleadings, June 20, 2012, A.P. Docket No. 2-2 at 2-3.

Count One requests a declaratory judgment:

1.     That the Note is in force and effect without a default;
2.     That the Mortgage is not presently subject to foreclosure and that the Defendant has no right to initiate foreclosure at this time;
3.     That the Defendant is in [sic] of the provision of the Note and Mortgage; and
4.     Such further and other relief as this Court may find proper.

Id. at 3.

4

## 2. Count Three - Easement

20.  Count Three asserts and realleges paragraphs one through nineteen above as if fully stated herein.

21.  The Deed contains in its legal description the grant of an easement for access described as follows:

"Seller conveys, in addition to the parcel described hereinabove, an easement of 25 feet on either side of the existing power line (for a total of 50 feet) across the Sellers adjoining property for the purpose of ingress and egress and to install water lines and other utilities only for as long as purchaser owns the said property."

22.  Defendant has attempted to block the Plaintiff's use of the said easement, as well as the existing roadways leading to the property.

23.  Without the use of the easement and the existing roadways, the property is landlocked, and was sold to Plaintiff by Defendant in this condition at the time of sale.

24.  The actions of the Defendant show a clear intent to unlawfully prohibit Plaintiff access to its property, depriving Plaintiff of the value of the Plaintiff's business operations associated with the property.

Id. at 4.

Count Three request a declaratory judgment:

1. That the easement is in force and effect;
2. That adjoining roadways are open to use as part of the use of the easements.
3. That the Defendant has no right to restrict the Plaintiff use of the easement and roadways.
4. That the Defendant is in violation of the same; and
5. Such further and other relief as this Court may find proper.

Id. at 4.

## 3. Count Five - Damages from Count One

29.  Count five asserts and realleges paragraphs one through twenty-eight above as if fully stated herein.

5

30.     Defendant recklessly, negligently, and/or wantonly violated the terms of the Note, Mortgage and easement contained in the Deed.

31.     As a direct and proximate result, Plaintiff was injured and damaged as alleged hereinabove.

Id. at 5.

The prayer for relief in Count Five reads, "Plaintiff demands compensatory and punitive damages, plus interest and costs against Defendant in an amount as set by this Court."

Id. at 5.

## B.  The Parties and Their Associates

The plaintiff Belle Mere Properties, LLC is a Texas Limited Liability Company. Ms. Che Williamson is its sole member.[4] Mr. Bernie Gomez is its authorized manager.[5] Mr. Gomez is a gaming developer and a member of GQ LLC, Bell Mere's financial backer.

Belle Mere leased the property it purchased from the defendant to Accuity Capital, LLC, another Texas Limited Liability Company. Plaintiff's Exhibit 21. Accuity leased the property to Dream, Inc, an Alabama non-profit charity operating a bingo hall on the property. The business is called Frontier Bingo.

Ms. Jimmy Carol McCulley, known to the parties and others as "JC," was at the time of trial employed by Dream, Inc. She previously worked for Mr. Gomez at GQ. Ms. McCulley performed various administrative functions for both companies. As such. she was directly involved in the business relationships between the plaintiff and the defendant.

Mr. Tim Herring was, or is, Ms. Williamson's husband. The Court was not made aware of his official connection with the plaintiff, but the evidence is clear that he had some positive influence on the relationships between the plaintiff's and the defendant's principals.

---

[4] Ms. Williamson signed the Purchase Agreement, Real Estate Mortgage Note, and Real Estate Mortgage for the plaintiff. Defendant Exhibits A, D, & E.

[5] Mr. Gomez signed a December 20, 2010, Agreement to Modify Contract between the parties for the plaintiff.  That agreement extended the closing date for the property purchase. Defendant's Exhibit C. Mr. Gomez also signed several GQ LLC checks as payments from the plaintiff to the defendant.

6

CBS Properties, the defendant, is an Alabama Limited Liability Company. Beverly Spencer is its sole member and its manager.[6]

## C. Applicable Law

Writing for the Court of Appeals for the Eleventh Circuit in Otwell v. Alabama Power Co., Case No. 13–12584, 2014 WL 1284968 (11th Cir. April 01, 2014), Circuit Judge Susan Harrell Black explained:

Declaratory Relief

Having assured ourselves that Article III's standing requirements have been met, we conclude the district court did not abuse its discretion in declining to issue a declaratory judgment concerning Appellants' purported riparian rights. It is well established that district courts have exceptionally broad discretion in deciding whether to issue a declaratory judgment, and the remedy is not obligatory. Wilton v. Seven Falls Co., 515 U.S. 277, 286–88, 115 S.Ct. 2137, 2142–43, 132 L.Ed.2d 214 (1995). The Supreme Court has explained that, "[s]ince its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants," and that "[t]he statute's textual commitment to discretion, and the breadth of leeway [the Court has] always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface." Id. at 286–87, 115 S.Ct. at 2142.

As the district court recognized, the question of whether Appellants have riparian rights in Smith Lake is not dispositive of their claims. Even if they have such rights, Alabama Power might not have violated those rights or might otherwise avoid liability for any number of reasons. Appellants did not have a right to a declaratory judgment, and the district court did not abuse its substantial discretion by assuming Appellants had riparian rights and then resolving their claims on an alternative basis. See Ameritas Variable Life Ins. Co. v. Roach, 411 F.3d 1328, 1330 (11th Cir.2005) ("The Declaratory Judgment Act is an enabling Act, which confers a discretion on courts rather than an absolute right upon the litigant." (quotation marks omitted)); see also Wilton, 515 U.S. at 289, 115 S.Ct. at 2144 ("[F]acts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within [the district court's] grasp."). Accordingly, we affirm the district court's denial of Appellants' motion for partial summary judgment.

---

[6] Mr. Spencer signed the Warranty Deed for the defendant and several checks for payments for unpaid premiums for insurance on the Belle Mere property.

Id. at *4.

Applying the above standards, this Court finds that because of the nature of the issues raised in the defendant's Verified Complaint this Court should exercise its discretion in deciding these parties' rights as presented in the complaint and at the trial of this proceeding.

### D.  Findings of Fact

### 1.  Undisputed Background Facts

Certain background facts are not disputed. The plaintiff and defendant entered into a Purchase Agreement on November 3, 2010, where the plaintiff agreed to buy, "not less than eight, but not more than twelve," acres of real property in Greene County, Alabama for $1,200,000.  The purchase was to include, "all improvements and a tract of land containing such improvements and immediately adjacent to the improvements more commonly known as Harley's Place located at 121 Old Patton Rd., Knoxville, Greene County, Alabama...." Plaintiff's Exhibit 4; Defendant's Exhibit A.

The plaintiff paid $100,000 earnest money. Id.

On January 22, 2011, the plaintiff leased the property to Accuity Capital, LLC for 60 months to end on Feb. 1, 2016. The base rent was $11,000 per month. Plaintiff's Amended Pretrial Statement at 2, A.P. Docket No. 116.  Accuity Capital, LLC subleased the property to Dream, Inc. an Alabama non-profit charity. When open, Dream, Inc. operated a bingo hall on the property.

The parties closed on the purchase on April 1, 2011, at which time the plaintiff executed a Real Estate Mortgage Note (Plaintiff's Exhibit 6; Defendant's Exhibit D) and Real Estate Mortgage (Plaintiff's Exhibit 7; Defendant's Exhibit E) in favor of the defendant and the defendant executed a Warranty Deed (Plaintiff's Exhibit 1; Defendant's Exhibit C) to the plaintiff.  The principal amount of the Note was $879,780.00. Monthly payments were $9,989.72 for 36 months with a balloon payment of $672,734.21 due April 1, 2014. Plaintiff's Amended Pretrial Statement at 2, A.P. Docket No. 116;  Defendant's Pretrial Statement at 2, A.P. Docket 114.

Also at closing, in addition to the $100,000 earnest money already paid, the plaintiff, with the assistance of GQ, LLC, an unrelated corporation but one operated by Mr. Gomez,  gave the defendant a check for $214,435. Plaintiff's Exhibit 9; Defendant's Exhibit F. That amount represented a "down payment" of $200,000, closing costs, prorated taxes, and the first mortgage payment of $9,989. Plaintiff's Amended Pretrial Statement at 2, A.P. Docket No. 116.

The parties agree that the $214,435 check was not negotiated but was held until replaced with a cashier's check for the same amount with the same terms.[7]

The Warranty Deed provided to the plaintiff was recorded in the Probate Office of Greene County, Alabama at Deed Book 174, Page 246 on April 7, 2011. Defendant's Pretrial Statement at 2, A.P. Docket 114.

Because the parties' Real Estate Mortgage Note, Real Estate Mortgage, Warranty Deed, and Purchase Agreement are such integral parts of the disputed matters, parts of each are quoted below.[8]

### a. The Real Estate Mortgage Note

The pertinent parts of the Real Estate Mortgage Note are:

1.    BORROWER'S PROMISE TO PAY

In return for a loan that we have received, we, Bellemere Properties, LLC, and each of us, promise to pay U.S. $879,780 to the order of the Lender. The Lender is C.B.S. Properties, LLC. We understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

2.    INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 6.5%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

3.    PAYMENTS

A.    Time and Place of Payments

---

[7] The Court cannot find that this $214,435 cashier's check was offered as an exhibit; however, Defendant's Exhibit LL is a copy of the deposit slip the defendant used to deposit a cashier's check for $214,000.00 and a GQ LLC check for $435.22.

[8] While the parties disagree about the application of these documents, there is no dispute as to the actual language.

We will pay the sum of $1,945.50 as pro-rated property tax at the closing. We will make the monthly payments on the 1st day of each month beginning on April 1, 2011. We will make these payments every month until we have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on April 1, 2014, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 144 B&V Drive, Knoxville, Alabama 35469 or at a different place if required by the Note Holder.

B.      Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $9989.72 for thirty-six months with a final payment of $$672,734.21 due April 1, 2014.

*****

6.      BORROWER'S FAILURE TO PAY AS REQUIRED

A.      Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 30 (thirty) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 10% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

B.      Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount.

C.      Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount

10

of principal that has not been paid and the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

D.     No Waiver by Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

E.     Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees and court costs.

7.     GIVING OF NOTICES

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(a) above or at a different address if I am given a notice of that different address.

Plaintiff's Exhibit 6; Defendant's Exhibit D.

## b. The Real Estate Mortgage

The pertinent parts of the Real Estate Mortgage are:

To have and to Hold the above granted property unto the said Mortgagee, Mortgagee's successors, heirs, and assigns forever; and for the purpose of further securing the payment of said indebtedness, the undersigned agrees to pay all taxes or assessments when imposed legally upon said premises, and should default be made in the payment of same, the said Mortgagee may at Mortgagee's option pay off the same; and to further secure said indebtedness, first above named undersigned agrees to keep the improvements on said real estate insured against loss or damage by fire, lightning and tornado for the fair and reasonable insurable value thereof, in companies satisfactory to the Mortgagee, with loss, if any, payable to said Mortgagee, as Mortgagee's interest may appear, and to promptly deliver said policies, or any renewal of said policies to said Mortgagee; and if undersigned fail to keep said property insured as above specified, or fail to deliver said insurance policies to said Mortgagee, then the

11

said Mortgagee, or assigns, ay at Mortgagee's option insure said property for said sum, for Mortgagee's own benefit, the policy if collected, to be credited on said indebtedness, less cost of collecting same; all amounts so expended by said Mortgagee for taxes, assessments or insurance, shall become a debt to said Mortgagee or assigns, additional to the debt hereby specially secured, and shall be covered by this Mortgage, and bear interest from date of payment by said Mortgagee, or assigns, and be at once due and payable by the Mortgagors to the Mortgagee.

Upon condition, however, that if the said Mortgagors pay said indebtedness, and the interest thereon and reimburses said Mortgagee or assigns for any amounts Mortgagee may have expended for taxes, assessments, and insurance, and interest thereon, then this conveyance to be null and void; but should default be made in the payment of any sum expended by the said Mortgagee or assigns, or should said indebtedness hereby secured, or any part thereof, or the interest thereon, remain unpaid at maturity, or should the interest of said Mortgagee or assigns in said property become endangered by reason of the enforcement of any prior lien or encumbrance thereon, so as to endanger the debt hereby secured, then in any one of said events, the whole of said indebtedness hereby secured shall at once become due and payable, and this mortgage be subject to foreclosure as now provided by law in case of past due mortgages, and the said Mortgagee, agents or assigns, shall be authorized to take possession of the premises hereby conveyed, and with or without first taking possession, after giving twenty-one days' notice, by publishing once a week for three consecutive weeks, the time, place and terms of sale, by publication in some newspaper published in said County and State, sell the same in lots or parcels or en masse as Mortgagee, agents or assigns deem best, in front on the Court House door of said County, (or the division thereof) where said property is located, as public outcry, to the highest bidder for cash, and apply the proceeds of the sale: First, to the expense of advertising, selling and conveying, including a reasonable attorney's fee; Second, to the payment of any amounts that may have been expended, or that it may then be necessary to expend, in paying insurance, taxes, or other encumbrances, with interest thereon; Third, to the payment of said indebtedness in full, whether the same shall or shall not have fully matured at the date of said sale, but no interest shall be collected beyond the day of sale; and Fourth, the balance, if any, to be turned over to the said Mortgagor and undersigned further agree that said Mortgagee, agents, or assigns may bid at said sale and purchase said property, if the highest bidder therefore, and undersigned further agree to pay a reasonable attorney's fee to said Mortgagee or assigns, for the foreclosure of this mortgage in Chancery, should the same be so foreclosed, said fee to be a part of the debt hereby secured.

Plaintiff's Exhibit 7; Defendant's Exhibit E.

### c. The Warranty Deed

The pertinent parts of the Warranty Deed:

Know All Men by These Presents: That in consideration of Ten and 00/100 Dollars ($10.00) to the undersigned grantor, in hand paid by the grantee herein, the receipt where is acknowledged, we, C.B.S. Properties, LLC, an Alabama LLC, hereinafter referred to as grantor, do hereby grant, bargain, sell and convey unto Bellemere Properties, LLC, a Texas LLC, hereinafter referred to as grantee, the following described real estate, situated in Greene County, Alabama to wit:

> See Exhibit "A" incorporated herein by reference.
>
> This conveyance is made subject to an 30-foot easement Seller reserves along the existing slag road on the subject property. Seller conveys, in addition to the parcel described hereinabove, an easement of 25 feet on either side of the existing power line (for a total of 50 feet) across the Sellers adjoining property for the purpose of ingress and egree [sic] and to install water lines or other utilities only for as long as purchaser owns the said property.

To Have and to Hold to the said grantee, Bellemere Properties, LLC, its heirs and assigns forever.

Plaintiff's Exhibit 1; Defendant's Exhibit C.

### d. The Purchase Agreement

The pertinent parts of the Purchase Agreement are:

7. CONVEYANCE. Conveyance of the real property by Seller to Purchaser shall be by way of a warranty deed subject to the Existing Mortgages. The deed shall reflect that title is to be taken in the name "Bellemere Properties, L.L.C., a Texas, L.L.C."

Seller also agrees to convey:

> a. Access to and use of the existing water supply to the subject property for a reasonable time to allow Purchasers to acquire their own water supply and meter;
>
> b. Right to use of existing utility access;

> c.   Reasonable access to the existing access roads across Seller's adjacent property for a reasonable time sufficient for Purchasers to complete their own access road from Highway 11 as designated in paragraph "d" below;
>
> d.   A 50 foot easement across Seller's Property from Highway 11 directly to the purchased parcel.  Purchaser shall be responsible for all improvements and maintenances of said easement.
>
> Purchaser agrees to give the Seller access across the parcel that is the subject of this purchase agreement for Seller to have access to his acreage adjacent to the subject parcel.
>
> 8.   INSURANCE.  Purchasers agree to maintain a policy of insurance against loss due to fire, theft or claims of liability and to include Seller as an insured entity to the extent of his interest until all obligations to Seller are satisfied and to provide to Seller a certificate of insurance reflecting said coverage.

Plaintiff's Exhibit 4; Defendant's Exhibit A.

## 2.  Additional (and mostly disputed) Facts and the Parties' Positions

### a.  Payments

There are three groups of mortgage payments which the Court has considered separately. The first group includes prepetition mortgage payments due from April 2011 through November 2011. Those are the payments due from date of purchase of the property until the plaintiff filed its state court complaint against the defendant which resulted in a temporary restraining order by the state court. The second group includes prepetition payments from December 2011 (from the start of the litigation) through April 2012 when the plaintiff filed the pending Chapter 11 case. The third group includes postpetition payments from April 2012 through the balloon payment due on April 1, 2014.

Common to groups one and two, the defendant contends that under the parties' Real Estate Mortgage Note, mortgage payments were in default if not paid on the first of every month. The defendant presented evidence that all, except for the first payment made at closing, were made after the first.

The plaintiff contends that under the parties' Real Estate Mortgage Note while mortgage payments may have been due on the first of the month, they would not be in default until 30 days after the first as provided in Paragraph 6 of the parties' Real Estate

14

Mortgage Note. The defendant presented evidence that all, including the first payment made at closing, were made within 30 days of the first of every month.

Evidence presented about the payments in each group is discussed below.

## Group One - Prepetition Payments
## from April 2011 through November 2011

Both parties presented documentary evidence of the payments and testimony about these payments. The Defendant's Exhibits and the Plaintiff's Exhibits representing those payments are similar, but not exactly the same.[9] Three witnesses testified extensively about each of these payments. They were Mr. Gomez, Ms. McCulley, and Mr. Spencer. Mr. Spencer's testimony consisted of both trial testimony and an affidavit submitted in support of an earlier motion for summary judgment filed by the defendant. Most, if not all of the testimony of all three of these witnesses, is summarized below.

| | |
|---|---|
| Payment for: | April 2011 |
| Check No: | GQ LLC Check No.1368 |
| Payee: | CBS Properties |
| Dated : | April 1, 2011 |
| Amount: | $214,435.22 |
| Exhibit Nos: | Plaintiff's 8 & Defendant's F |

This check was issued at closing. $200,000 was the down payment, $2,500 was closing costs, $1,945.50 was for taxes, and $9,989.72 was the first mortgage payment. This check was not negotiated. Again, the parties agree that a cashier's check was substituted for this check and the cashier's check was negotiated. See Note 7 above.

---

[9] The only payment which the parties agree was timely was the April 2011 payment that was part of the closing payment on April 1, 2011.

Payment for:          May 2011
Check No:             GQ LLC Check No. 1412
Payee:                CBS Properties
Dated :               May 5, 2011
Amount:               $9,989.72
Exhibit Nos:          Plaintiff's 9 & Defendant's G

Mr. Gomez testified that this check was for the May 2011 Payment, and that Mr. Spencer came by the bingo hall and picked it up.

Ms. McCulley testified that Mr. Spencer came by the bingo hall and picked up this check.

Mr. Spencer testified at trial that he went to the Frontier Bingo Hall, and Mr. Gomez wrote out this check and gave it to him.

Mr. Spencer's Affidavit testimony was, "The May 2011 payment under the Note was paid on or about May 5, 2011 by GQ, LLC.  ...  I do not have the original of this check, as it was deposited by me upon receipt." Exhibit "A" (A.P. Docket No. 60) to Defendant's Motion for Partial Summary Judgment (A.P. Docket No. 59) at Paragraph 9.


Payment for:          June 2011
Check No:             Cashier's Check No. 6558701773
Payee:                CBS Properties
Dated :               June 29, 2011
Amount:               $9,989.72
Exhibit Nos:          Plaintiff's 10 & Defendant's H

Mr. Gomez testified that after the bingo hall was closed on June 1, 2011, he decided to pay with cashier's checks rather than GQ LLC checks. He testified that this check was for the June payment, and that Ms. McCulley delivered it to Mr. Spencer. At that time, Ms. McCulley was working in human resources for GQ.

Ms. McCulley testified that she saw this check in her office, and that Mr. Spencer came by that office and picked up the check.

Mr. Spencer testified at trial that he received this check on the 30th and deposited it that same day.

Mr. Spencer's Affidavit testimony was, "The June 2011 payment under the Note was paid on or about by [sic] June 30, 2011, by GQ, LLC.  ...  I do not have the original of this check, as it was deposited by me upon receipt." Id. at Paragraph 10.

16

| Payment for: | July 2011 |
|---|---|
| Check No: | Cashier's Check No. 6562902436 |
| Payee: | CBS Properties |
| Dated : | July 28, 2011 |
| Amount: | $9,989.72 |
| Exhibit Nos: | Plaintiff's 11 & Defendant's I |

Mr. Gomez testified that this Check was for the July payment. He said the events regarding this payment were "kind of messy." Ms. McCulley and Mr. Spencer met at the property and he, Mr. Gomez, was informed that the check was delivered after Mr. Herring talked to Mr. Spencer.

Ms. McCulley testified that she took this check to Mr. Spencer at one of his businesses. She said Mr. Spencer refused that check and told her she needed to talk to his attorney. Ms. McCulley then called Mr. Herring and told him that Mr. Spencer would take the check but would not give her a receipt. She said Mr. Herring told her to deliver the check without a receipt. She said Mr. Herring talked to Mr. Spencer after which she delivered the check to Mr. Spencer at his towing company where he accepted it.

Mr. Spencer testified at trial that he got this check on August 10th and deposited it that day. That testimony agrees with Defendant's Exhibit J which is a copy of a deposit slip for deposit of $9,989.72 to the account of CBS Properties on August 10, 2011.

Mr. Spencer's Affidavit testimony was, "The July 2011 payment under the Note was paid on August 2011. ... I do not have the original of this check, as it was deposited by me upon receipt." Id. at Paragraph 11.

| Payment for: | August 2011 |
|---|---|
| Check No: | Cashier's Check No. 6562902550 |
| Payee: | CBS Properties |
| Dated : | August 25, 2011 |
| Amount: | $9,989.72 |
| Exhibit Nos: | Plaintiff's 12 & Defendant's K |

Mr. Gomez testified that this Check was for the August payment. He purchased the cashier's check, and Mr. Herring arranged with Mr. Spencer for Ms. McCulley to deliver it to Mr. Spencer.

Ms. McCulley testified that she tried to get Mr. Spencer to accept this payment, but he was adamant about not doing so. She said Mr. Spencer came by the bingo hall two or three times a week, and she hoped he would accept the payment. Expecting he would take it eventually, she kept it at the GQ office. Mr. Spencer never accepted this check.

Mr. Spencer testified at trial that he did not get this check until late September. He added that the plaintiff owed him for a water bill and insurance at this same time. He did not accept this check.

Mr. Spencer's Affidavit testimony was, "The August 2011 payment under the Note was tendered by GQ, LLC to CBS on or about August 25, 2011, but said payment was not accepted by CBS because it was late under the terms of the Note." Id. at Paragraph 12.

17

```
Payment for:           September 2011
Check No:              GQ LLC Check No. 1504
Payee:                 CBS Properties
Dated :                September 27, 2011
Amount:                $9,989.72
Exhibit Nos:           Plaintiff's 13
```

Mr. Gomez testified that this check was for the September payment, but he could not remember why a GQ check rather than a cashier's check was used. He said he had left some signed checks with Ms. McCulley with the hope that Ms. McCulley could get Mr. Spencer to accept this payment along with the August payment.

Ms. McCulley testified that when Mr. Spencer stopped by the bingo hall she tried to deliver this check and the check for the August payment. He refused both payments.

The defendant did not offer this check as an exhibit. Mr. Spencer's affidavit testimony was, "The September 2011 payment under the Note was never tendered to CBS." Id. at Paragraph 13.

```
Payment for:           October 2011
Check No:              Cashier's Check No. 6561103254
Payee:                 CBS Properties
Dated :                October 29, 2011
Amount:                $9,989.72
Exhibit Nos:           Plaintiff's 14 & Defendant's L
```

Mr. Gomez testified that this check was for the October payment. He said there was an attempt to deliver this check but that attempt failed.

Ms. McCulley testified that she saw this check in the GQ office, but because Mr. Spencer had told her he would not be accepting any checks she did not deal with this one and did not have any conversations with Mr. Spencer about it.

Mr. Spencer testified at trial that he never saw this check.

Mr. Spencer's Affidavit testimony was, "The October 2011 payment under the Note was tendered by GQ, LLC to CBS on or about October 29, 2011, but said payment was not accepted by CBS because it was late under the terms of the Note." Id. at Paragraph 14.

| | |
|---|---|
| Payment for: | November 2011 |
| Check No: | Cashier's Check No. 6562802334 |
| Payee: | CBS Properties |
| Dated : | November 30, 2011 |
| Amount: | $9,989.72 |
| Exhibit Nos: | Plaintiff's 15 & Defendant's M |

Mr. Gomez testified that he purchased this cashier's check for the November payment. He made arrangements for it to be delivered, but it was not. He even employed an attorney to help him make the payment but that failed also. He was told that foreclosure proceedings were ongoing. He later met Mr. Spencer at Hooters restaurant.

Ms. McCulley testified that she saw this check in the GQ office, but she did not have any involvement with delivering this check to Mr. Spencer.

Mr. Spencer testified at trial that he never saw this check.

Mr. Spencer's Affidavit testimony was, "The November 2011 payment under the Note was tendered by GQ, LLC to CBS on or about November 30, 2011, but said payment was not accepted by CBS because it was late under the terms of the Note." Id. at Paragraph 15.

### Group Two - Prepetition Payments from December 2011 through April 2012

The parties agree that no payments were tendered or made after November 2011. There appear to be two legitimate reasons for this result. One, the defendant remained adamant that it would not accept any payments. Two, the plaintiff filed a complaint against the defendant in state court on November 16, 2011. Because of these reasons, the Court finds, as the payments relate to the issue of default in the pending Verified Complaint, consideration of them is not relevant except as to whether there are payments which are still owed.

### Group Three - Postpetition Payments from April 2012 through April 1, 2014

The parties agree that all postpetition mortgage payments, that is from April 2012 through March 2013, were made timely.[10] In contrast, the debtor's monthly operating reports do not agree. Those reports do not show that all payments were made. The Court will rely on the parties to resolve this issue; however, as these payments relate to the pending Verified Complaint, the Court finds that consideration of

---

[10] The balloon payment referred to in Paragraph 3B of the Real Estate Mortgage Note was due on April 1, 2014. It is the subject of the plaintiff's pending Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing. A.P. Docket No. 166.

postpetition payments is not relevant except as to whether there are payments which are still owed.

### b. Insurance

The parties agree that their Purchase Agreement and the Real Estate Mortgage required the plaintiff to maintain certain insurance on the property. The parties disagree whether that was done.

While they agree that insurance was in place for a time after closing, they disagree as to whether it continued, or even if it was necessary to continue. The circumstances were unusual. Dream Inc.'s bingo operations were closed by the State of Alabama shortly after opening. When closed, certain machines used for its operation were removed from the property leased for the bingo hall. Mr. Gomez testified that a significant portion of the insurance for the property was in place to protect these machines. With the machines gone, he and others believed that the amount of the insurance could be reduced. Consequently, he attempted to make those arrangements which included not paying insurance premiums but relying on credit for what was then considered overpayment for the protection of removed machines.

Apparently the company insuring the property did not agree. Mr. Spencer testified that the company contacted him on three separate occasions advising him that the insurance on the property would be cancelled if certain premiums were not paid. The documentary evidence supports that testimony.

The company's first contact with Mr. Spencer, represented by Defendant's Exhibit N, was a June 12, 2011, "Notice of Intent to Cancel Insurance Coverage" which Mr. Spencer received. This notice explained that if the June 1, 2011 premium of $1,349.00 was not paid for the plaintiff's property by June 22, 2011, the insurance would be cancelled. Mr. Spencer paid the $1,349.00 premium on June 22, 2011, which is represented by Defendant's Exhibit O.

The company's second contact with Mr. Spencer, represented by Defendant's Exhibit P, was a July 11, 2011, "Notice of Intent to Cancel Insurance Coverage" which Mr. Spencer received. This notice explained that if the July 1, 2011, premium of $1,349.00 was not paid for the plaintiff's property by July 21, 2011, the insurance would be cancelled. Mr. Spencer paid the $1,349.00 premium on July 26, 2011, which is represented by Defendant's Exhibit Q.

The company's third contact with Mr. Spencer, represented by Defendant's Exhibit R, was an August 11, 2011, "Notice of Intent to Cancel Insurance Coverage" which Mr. Spencer received. This notice explained that if the August 1, 2011, premium of $1,349.00 was not paid for the plaintiff's property by August 21, 2011, the insurance would be cancelled. Mr. Spencer's wife paid the $1,349.00 premium on August 19, 2011, which is represented by Defendant's Exhibit S.

Case 12-70018-BGC   Doc 123   Filed 05/20/14   Entered 05/20/14 15:47:21   Desc Main
Document      Page 20 of 40

### c. Actions Regarding the property

Factually, the parties disagree about certain actions taken in regard to the property. Those include: (1) turning off the water; (2) closing the gate and blocking access to the property; and (3) the number and location of easements for power, water, and an access road. Each is discussed below.

### (1) Turning Off the Water

The plaintiff complains that at one time the defendant shut off water to the property. There was evidence about two instances where water may have been turned off. The Court cannot determine from the evidence when these occurred, but it can determine that neither is actionable.

One, Mr. Spencer testified that a significant water bill was generated during the time the bingo hall was closed.[11] It was later discovered that there was a leak which caused the excess water usage. That leak was repaired.

Two, Mr Lawrence Fair, a local water contractor, testified about another suspension of water service. He testified that he had done work for Mr. Spencer and that Mr. Spencer called him for a repair. It seems that Mr. Spencer bumped a fire hydrant and asked Mr. Fair to repair the damage. Mr. Far testified that he dug up the hydrant but cold not repair it. As an alternative he took the hydrant out and capped the leak.[12]

In regard to the issue of damages the plaintiff may have suffered because of a water stoppage: (1) there was no evidence of damage offered; and (2) the Court cannot find that there is any evidence that at anytime the defendant maliciously disconnected the water being used by the plaintiff.

### (2) Closing the Gate
### and Blocking Access to the Property

The plaintiff also complains that the defendant blocked access to the property. Plaintiff's Exhibits 22 N and O are photographs of a trailer and a flatbed truck parked at the gate to the property. The plaintiff contends that the vehicles were placed there specifically to block access to the property. While that may be technically true, Mr.

---

[11] The Plaintiff's <u>Amended Pretrial Statement</u> represents that the defendant turned off the water on December 1, 2001, during the time the state court TRO was in place. However, there is no evidence that the state court found that any damage occurred at that time.

[12] Mr. Fair's extensive testimony about the location of the plaintiff's potential water line and how that testimony related to the question of the parties' easement disagreement is discussed in detail below.

Spencer explained that the gates were blocked during the time that the bingo hall was closed. He testified that at first he just locked the gate, but someone removed the hinges and opened the gate. Thereafter, he put the trailer in front of the gate.

Again, like the question regarding water usage, there was no evidence of damage offered, and the Court cannot find that there is any evidence that at anytime the defendant maliciously blocked the plaintiff's access to its property.

### (3) The Number and Location of
### Easements for Power, Water, and an Access Road

The parties' real estate contracts provided for one or more easements to allow the plaintiff to install electrical service, a water line, and an access road. The parties disagree strongly about the number of easements conveyed by the defendant to the plaintiff and the location of those easements. Like their positions regarding their real estate note and mortgage, their positions on the location of and number of easements intended or conveyed differ greatly.

The plaintiff contends that the number of and location of easements have yet to be determined. The defendant contends that the location of the power easement has been located absolutely and with that location comes the location of the water easement and the location of whatever road the plaintiff may construct to its property.

The parties argue that their real estate contracts conflict. Whether they do or not, those contracts are of course very important in resolving these issues. As quoted above, the first documentary facts about easements are included in the parties' Purchase Agreement. Its pertinent part reads:

Seller also agrees to convey:

     a.     Access to and use of the existing water supply to the subject property for a reasonable time to allow Purchasers to acquire their own water supply and meter;

     b.     Right to use of existing utility access;

     c.     Reasonable access to the existing access roads across Seller's adjacent property for a reasonable time sufficient for Purchasers to complete their own access road from Highway 11 as designated in paragraph "d" below;

     d.     A 50 foot easement across Seller's Property from Highway 11 directly to the purchased parcel. Purchaser shall be responsible for all improvements and maintenances of said easement.

22

> Purchaser agrees to give the Seller access across the parcel that is the subject of this purchase agreement for Seller to have access to his acreage adjacent to the subject parcel.

Plaintiff's Exhibit 4; Defendant's Exhibit A.

Also as quoted above, the pertinent part of the parties' Warranty Deed includes the second documentary facts regarding easements. It reads:

> This conveyance is made subject to an 30-foot easement Seller reserves along the existing slag road on the subject property. Seller conveys, in addition to the parcel described hereinabove, an easement of 25 feet on either side of the existing power line (for a total of 50 feet) across the Sellers adjoining property for the purpose of ingress and egree [sic] and to install water lines or other utilities only for as long as purchaser owns the said property.

Plaintiff's Exhibit 1; Defendant's Exhibit C.

On its face, the Purchase Agreement contemplated that until a certain time, which the Agreement did not identify, the plaintiff generally would have temporary water, power, and access to its property. On its face, the Warranty Deed specifically conveyed certain easements. While both documents referred to a 50-foot easement, neither document identified the location of that easement as it related to the land, but the Warranty Deed did locate whatever easements were conveyed in relation to an "existing power line" and specifically stated that the water line and road access were to be located with that existing line. Unfortunately, the Warranty Deed did not identify which power line.

In regard to easements, there is no disagreement that the parties operated under the Purchase Agreement from the date it was signed until the Warranty Deed was executed. There was extensive testimony from both sides about what occurred during that time and after and which document should be given deference. Much of that testimony was either the parties's explanations of how the documents did or did not locate the easements, how those documents conflicted with one another, or the parties' rationalizations of where the easements should be located. The Court did not find that testimony helpful in identifying the number of or location of the easements.

The parties also submitted extensive documentary evidence, most of which were photographs of the property showing existing and installed power lines and the location of various roads around the property. Like the parties' testimony, the Court did not find

this evidence helpful in identifying the number of or location of the easements because its importance was dependent on that testimony.[13]

In contrast, the Court found the testimony of Mr. Lawrence Fair very helpful. Mr. Fair was an independent witness not connected with either side and without any pecuniary interest in the outcome of this proceeding.

Mr. Fair was retired from a government position related to installment of water lines. He knew Mr. Spencer and had installed most, if not all, of the water lines for Mr. Spencer on the property adjacent to the purchased property. Ms. McCulley contacted him about installing a water line for the plaintiff separate from Mr. Spencer's.[14] Mr. Fair testified that he agreed to look at the options and arranged a meeting at the property with Ms. McCulley and then Mr. Gomez.

Three events associated with Mr. Fair's meeting with Mr. Gomez generate the best evidence for identifying the number of and location of the easements.[15]

The first event was the location of the plaintiff's power line. The parties agree that until the Warranty Deed was executed, they were operating under the Purchase Agreement. They also agree that during that time, the plaintiff installed, because of the significant number of bingo machines in the hall, a three-phase power line. Such a line was necessary to supply sufficient power to the hundreds of bingo machines in the hall. The location of that installation is quite an important piece of the easement puzzle.

The second event was an improbable meeting between Mr. Fair and Mr. Spencer on the purchased property. Mr. Fair testified that while he was looking around the property on his own he met Mr. Spencer who asked him what he was doing. After Mr. Fair explained, Mr. Spencer told him that while the two were friends, Mr. Fair needed to leave the property.

---

[13] The parties asked the Court to visit the site. The Court declined, contemplating that such a visit might generate evidence that normally would not be admissible.

[14] Ironically, Mr. Fair, called as a defendant's witness, was the ex-father-in-law of Ms. J.C. McCulley, one of the plaintiff's witnesses. During Ms. McCulley's testimony, the defendant attempted to attack her credibility because she had a personal relationship with Mr. Gomez during some of the time involved in this matter and was married to someone else at the same time. Ms. McCulley testified that her husband had left her, and she was in the process of a divorce, which, given the status of Mr. Fair's relationship with her, must have come to pass. The Court did not find that Ms. McCulley's relationship with Mr. Gomez or her marital status before or at the time of trial had any impact on her credibility as a witness in this proceeding.

[15] Mr. Fair testified that he first looked into drilling a well but determined that was not practicable.

The third event was Mr. Fair's actual meeting with Mr. Gomez at the property. It was directly influenced by the other two.

Because of Mr. Fair's "confrontation" with Mr. Spencer, Mr. Fair was concerned about the plaintiff's right to have a water line installed. Consequently, during his meeting with Mr. Gomez at the property, he specifically asked Mr. Gomez if the plaintiff had the right to put in a water line. Mr. Fair testified that not only did Mr. Gomez tell him, "I got this for my utilities and my road," (Unofficial Transcript), but Mr Gomez also told him that the plaintiff wanted to run the line straight down the property to Highway 11 to a point where the water authority would set a meter. Mr. Fair explained, as these three events of the easement puzzle come together, that the area Mr. Gomez described, was both where the new three-phase power line had been installed and the area where he and Mr. Gomez walked down that line toward Highway 11 surveying the possible location for a water line.[16]

Based on this independent evidence, the Court finds, as a matter of fact, that the plaintiff has three easements along the location of the three-phase power line. The legal basis of this finding is discussed below in the Court's conclusions of law.[17]

### d. The Defendant's Attempt to Foreclose

Prior to the plaintiff filing the pending bankruptcy case, the defendant attempted to foreclose its interest in the property.

The parties' note and mortgage gave the defendant the right, under certain situations, to accelerate payments and demand full payment and eventually to foreclose its interest if such accelerated payments were not made. When the plaintiff did not

---

[16] The parties' pleadings agree with these factual findings. The Plaintiff's Amended Pretrial Statement includes, "On April 7, 2012, Dream, Inc., reopened the bingo hall pursuant to Court Order, and after obtaining water service on its own. The water line was run by the Ralph-Fosters Water Authority at the location selected by CBS. This required the boring of water lines under Highway 11." A.P. Docket No. 116 at 5 (emphasis added). The Defendant's Post-Trial Brief reads, "For reasons which were not made clear through testimony, Plaintiff chose not to construct its own access road at the agreed upon location, although Plaintiff did install water lines and three phase power lines at that location." A.P. Docket No. 121 at 6 (emphasis added).

[17] This Court disagrees with the parties that the Purchase agreement and the Warranty Deed conflict. Certainly, the provisions in regard to easements are not the same, but they do not conflict. The Agreement provided one scenario; the Deed provided another. And as discussed below in the Court's conclusions of law, the law in Alabama would eliminate any such conflict if one did exist as it directs this Court to find that the provision in the Warranty Deed controls. It appears factually and legally that the plaintiff chose the location of all of the easements when it located its three-phase power line. The only reasonable factual conclusion, based on the above evidence, is that the reference in the warranty deed to the "existing power line" was a reference to the three-phase line the plaintiff installed.

25

make monthly mortgage payments according to the defendant's interpretation of that note and mortgage, the defendant began the foreclosure process.

Plaintiff Exhibits 23 and 24 are letters to the plaintiff giving "Notice of Foreclosure." Those letters state that the "Nature of Breach" was the plaintiff's "Failure to make monthly payments as promised." Id. The letters went on to describe the action required of the plaintiff to cure the default and if not cured, that payments would be accelerated. Id.[18]

The parties agree, as presented in their pretrial statements, A.P. Docket Nos. 114 and 116, that foreclosure did not occur.[19] While the process progressed to the "Notice of Mortgage Foreclosure" stage as represented by Defendant's Exhibits DD and EE, that is, copies of legal notices in the Greene County Independent, as the parties' pretrial statements explain, before the process could be completed, the plaintiff filed a complaint in state court on November 16, 2011, seeking to stop the foreclosure. Defendant's Pretrial Statement, A.P. Docket No. 114; Plaintiff's Amended Pretrial Statement, A.P. Docket No. 116.

On November 28, 2011, the state court issued a temporary restraining order stopping the foreclosure. Id.[20] The TRO was later extended.[21] And the foreclosure, then

---

[18] While the "Nature of Breach" was limited to the failure to make monthly payments, the "Action Required" section of the notice included numerous other alleged defaults such as failure to pay insurance and late charges.

[19] But the parties do not agree that proper procedures were followed before the foreclosure failed. For example, the plaintiff claims it never received the notices because they were not delivered to the correct address. This Court is intimately familiar with disputes of this type, particularly in regard to foreclosure procedures. See In re Sharpe, 391 B.R. 117 (Bankr. N.D. Ala. 2008). And while there was extensive argument this proceeding about the foreclosure process, it is not necessary for the Court to resolve any issued associated with that process. This Court is reminded, "Sound judicial policy counsels against deciding complicated legal issues where a clear, principled, alternative basis for reaching the same result exists." TI Federal Credit Union v. DelBonis, 72 F.3d 921, 927 (1st Cir.1995). In this situation, the state court stopped the foreclosure. Any new foreclosure would have to start anew.

[20] Even if the foreclosure had not been stopped by the state court and was later completed, it would have been set aside in this Court. Because of this Court's ruling herein that mortgage payments were not in default until after 30 days from the first of each month, the basis of the acceleration would have been faulty, and thus the foreclosure would have been faulty. In contrast, the defendant argues that even if that were true, because the plaintiff did not make all required insurance premium payments, it was in default. The defendant considered this condition as an alternative justification to foreclose. While this argument is logical, the facts associated with the attempted foreclosure and the parties' mortgage contract's peculiar provisions call it into question. First, there is a serious question that any failure to make insurance payments was not properly noticed in Plaintiff's Exhibits 23 and 24 under the "Nature

scheduled for January 9, 2012, was cancelled.[22]

### E. Declarations of the Parties' Rights as Conclusions of Law

#### 1. Count One

##### a. Mortgage Payments

As stated earlier, there are three groups of mortgage payments to consider. One includes prepetition payments due from April 2011 through November 2011. Those are the payments due from date of purchase of the property until the plaintiff filed its state court complaint against the defendant. A second includes payments from December 2011 (from the start of the litigation) through April 2012 when the plaintiff filed the pending Chapter 11 case. The third group includes postpetition payments from April 2012 through the balloon payment due on April 1, 2014.

There are four related issues in regard to these payments. The Court must decide: (1) when were payments due; (2) when would default occur if the payments

---

of Breach" notice given. The breach there was defined only in terms of monthly mortgage payments. Second, as discussed below, there is a serious question of <u>when</u> the defendant could have brought a "default" action under the mortgage in regard to missed insurance payments. The mortgage appears to require the defendant to wait until the loan matured to determine whether any funds it advanced had been reimbursed. The mortgage includes, "should default be made in the payment <u>of any sum expended by the said Mortgagee</u> or assigns, or should said indebtedness hereby secured, or any part thereof, or the interest thereon, <u>remain unpaid at maturity</u>...." <u>Id</u>. (emphasis added).

[21] The injunction created by the TRO was dissolved by the parties after the bankruptcy was filed. See this Court's Order entered October 10, 2012. A.P. Docket No. 24.

[22] In addition to stopping the foreclosure, it is important to recognize that one of the probable unintended consequences of the extension of the TRO was it prevented the defendant from foreclosing in the future unless it started the entire process from the beginning. When the defendant was prohibited from completing its legal advertisement of the mortgage foreclosure, its required third and final legal notice could not then be published in the local paper. This Court has previously recognized that such required procedural niceties must be enforced. See <u>Brown v. Minor Heights Fire District (In re Brown)</u>, 221 B.R. 849 (Bankr. N.D. Ala. 1998). Consequently, even if the defendant had complied with all other requirements of foreclosure, or that the plaintiff had not filed the pending case, the foreclosure could not have gone forward. Therefore, if the defendant intends on attempting another foreclosure, it must start that process from the beginning.

27

were not made when due; (3) when were payments made; and (4) what payments, if any are still due.[23]

As the discussion below shows, those four issues are intertwined. One or more may be answered with the same facts and explanation. Similarly, the three groups of payments are compressed into two for purposes of the plaintiff's declaratory judgment request and declaration of the parties' rights. Those two groups are: (1) Prepetition Payments; and (2) Postpetition Payments.

### (1) Prepetition Mortgage Payments

In regard to all prepetition mortgage payments, that is those for April 2011 through April 2012, the Court must first decide: (1) when were payments due and when would default occur if the payments not made when due; and (2) when were payments actually made.

### (a) When Were Payments Due
### and When Would Default Occur?

The basis of Count One is that the plaintiff did not make all payments required by the parties' contracts thereby allowing the defendant-mortgagee to accelerate its loan and ultimately foreclose its interest. While there is some disagreement that the plaintiff did not actually make all of the payments required, the parties' principal disagreement arises because of their different interpretations of when those payments were due. As discussed above, the defendant contends that the language in Paragraph 3A of the "Real Estate Mortgage Note" that reads, "We will make the monthly payments on the 1st day of each month beginning on April 1, 2011" _required_ the plaintiff to make payments on the first of each month, and that if payments were not on the first of each month the plaintiff was in default.

The plaintiff contends that while the payments might have been due on the first, default under the Real Estate Mortgage Note could not occur until 30 days after the first. The answer lies in the relationship between Paragraph 3 "Payments" and Paragraph 6 "Borrower's Failure to Pay as Required" of the Note.

---

[23] Conspicuous in its absence is a section on "**where** payments were to be made." Throughout the pleadings and trial, the parties argued about the correct addresses of the plaintiff's property, the defendant's property, and where certain documents should be served or delivered. The plaintiff claims it never received notices of the attempted foreclosure because they were not delivered to the correct address. Similarly, the defendant contends that even when it acknowledged receiving certain checks, those checks were not delivered to the correct address. While there is extensive evidence from both sides, the Court cannot find that resolution of this issue would benefit anything. Both parties deviated from what the other expected of them, and in most, if not all instances, whatever needed to be delivered was in fact delivered. Where there is no harm, this Court cannot find that there is any foul.

Again, as quoted above, the pertinent part of Paragraph 3 reads:

A.      Time and Place of Payments

We will pay the sum of $1,945.50 as pro-rated property tax at the closing. We will make the monthly payments on the 1st day of each month beginning on April 1, 2011. We will make these payments every month until we have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on April 1, 2014, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date."

I will make my monthly payments at 144 B&V Drive, Knoxville, Alabama 35469 or at a different place if required by the Note Holder.

Id. And again, as quoted above, the pertinent part of Paragraph 6 reads:

A.      Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 30 (thirty) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 10% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

B.      Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and all the interest that I owe on that amount.

C.      Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal that has not been paid and the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is delivered or mailed to me.

29

<u>Id</u>.

While most standard real estate notes and mortgages would have easily answered both of those questions, these do not. And while many courts, including this one, are quick to say the documents represent, "what the parties intended," there is no definitive evidence before this Court in this case that helps explain anything near what these parties intended in their note and mortgage in regard to when a default occurred if payments were not made. It is therefore left to this Court to decode the loan documents' language to reach a reasonable interpretation of when payments were due and if not paid when due, when default occurred.

As quoted above, the Real Estate Mortgage Note attempts to controls the time of payment and the consequences of not making payments within that time. The plaintiff agreed to, "make the monthly payments on the 1st day of each month...." <u>Id</u>. And then promised, "to pay a late charge" to  the defendant if the defendant did not, "receive the full amount of any monthly payment by the end of 30 (thirty) calendar days after the date it is due...." <u>Id</u>. Of course, again, the document did not define when the payment was due as, in that regard, it included only the plaintiff's pronouncement to pay on the first of each month.

Like the note, the parties' mortgage is of no specific help in answering these questions. Peripherally, in regard to payments there are only two pertinent events which trigger default. They are:

> **should default be made in the payment of any sum expended by the said Mortgagee or assigns, <u>or</u> should said indebtedness hereby secured, or any part thereof, or the interest thereon, remain unpaid at maturity**, or should the interest of said Mortgagee or assigns in said property become endangered by reason of the enforcement of any prior lien or encumbrance thereon, so as to endanger the debt hereby secured, then in any one of said events, the whole of said indebtedness hereby secured shall at once become due and payable, and this mortgage be subject to foreclosure

<u>Id</u>. (emphasis added).

So when were payments due, and when would default occur if payments were not made?

As stated above, the answer lies in the relationship of Paragraph 3 "Payments" to Paragraph 6 "Borrower's Failure to Pay as Required" of the Real Estate Mortgage Note. In that regard this Court must ask: Where in the note is there a provision that default occurs if payment is not made on the first? The answer is, there is none. The only consequence of a failure not to make a payment on the first of a month lies in Paragraph 6, and even <u>that</u> consequence is delayed as it provides that a late fee is due

if a payment is not paid within 30 days. And then, and only then, as paragraph 6 explains, would there be default.  The only reasonable conclusion then, based on the documents, is that " **a due date**" for the plaintiff was contemplated only for purposes of calculating **lateness**.  Default therefore could occur only after 30 days from the first of the month, and only then if the payment was not made within that 30-day period.

Therefore, based on the above, the Court finds that under the parties' note and mortgage, the plaintiff's monthly mortgage payments were due, for purposes of default, within 30 days from the first of the month. If paid (or tendered as the next discussion explains) before that 30-day window closed, there was no default.

The next question then becomes: When were payments made? Regardless of when they were due, if they were not made when due, that is within their 30-day periods, default still could have occurred.[24]

---

[24] Remembering that the legal umbrella under which all of the parties' issues merge is the plaintiff's request for declaratory judgment, the Court must ask: Who has the burden of proof to show that payments were made or not made? It appears generally that it is the plaintiff's burden, although that burden may lie differently in other situations. See generally American Safety Indem. Co. v. T.H. Taylor, Inc., Case No. No. 11-12245, 2013 WL 978804 (11th Cir. March 14, 2013, cited in conformity with Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007 and Eleventh Circuit Rules 36-2, 36-3.

See also Auburndale State Bank v. Dairy Farm Leasing Corp.,890 F.2d 888 (7th Cir. 1989) which includes:

We find that the trial judge, in the present case, erred by creating a presumption of ownership in favor of the general interest holder. The Strauss dicta are not sufficient authority for such a rule in the face of the general rules on burden of proof. The general rule is that the party that asserts the affirmative of an issue has the burden of proving the facts essential to its claim. Miller v. Milwaukee Odd Fellows Temple, 206 Wis. 547, 240 N.W. 193, 199 (1931) (party seeking to establish the invalidity of the defendant's title assumed the burden of proof on that issue); Chybowski v. Bucyrus Co., 127 Wis. 332, 106 N.W. 833, 837 (1906) (plaintiff loses personal injury suit, because he claimed that a steam hammer was defective but failed to present credible proof of that allegation); 29 Am.Jur.2d Evidence § 127 (1967). Another way of stating this rule is that the party who would lose if no evidence were presented has the burden. 29 Am.Jur.2d Evidence § 128 (1967) (citing Thoe v. Chicago, Milwaukee & St. Paul R.R. Co., 181 Wis. 456, 195 N.W. 407 (1923)); Annotation, Burden of Proof in Actions under General Declaratory Judgment Acts, 23 A.L.R.2d 1243, 1253 (1952).

Id. at 893.

**(b)  When Were Payments Made?**

**(I)  The April 2011 through November 2011 Prepetition Payments**

In regard to the prepetition payments for April 2011 through November 2011, as the detailed findings of fact above show, the testimony of the three witnesses agree (notwithstanding Mr. Spencer's trial testimony) that all payments were either made, or at least tendered, within the 30-day time frame established above, or if not, they were accepted by the defendant later. The discussion below explains.

It is not surprising that the trial testimony of Mr. Gomez and Ms. McCulley agreed and that their testimony disagreed with the trial testimony of Mr. Spencer. If that were all for the Court to consider, it would be difficult to reconcile and to reach a decision; however, Mr. Spenser's affidavit testimony tips the scales in favor of a decision that all payments were either made or tendered timely, or at least accepted after being late.[25]

As discussed above, Mr. Spencer's affidavit stated that other than the September 2011 payment, all payments were either accepted by him and deposited or were tendered within the 30-day period.[26] Excerpts from that testimony clearly support this conclusion.[27] Those read:

8.     The **April 2011** payment under the Note was paid on April 1, 2011 by GQ, LLC. ...  I do not have the original of this check, as it **was deposited** by me upon receipt.

9.     The **May 2011** payment under the Note was paid on or about May 5, 2011 by GQ, LLC. ...  I do not have the original of this check, as it **was deposited** by me upon receipt.

---

[25] The Court agrees with the defendant that waiver of a default may not be considered waiver of a future default. See In re Sharpe, 391 B.R. 117 (Bankr. N.D. Ala. 2008) where this Court wrote, "The law in Alabama is, and has been for over 100 years, that a creditor does not waive the right to act on a future default by accepting payment of a past default. Id. at 165 citing In Parker v. Oliver, 106 Ala. 549, 18 So. 40, 42 (1895). However, the evidence shows that there was not one check here that was either not tendered timely or accepted after being tendered late.

[26] Again, the Court acknowledges that the defendant's position is that the payments were in default if not made on the first of the month. However, the Court finds Mr. Spencer's affidavit testimony to be refreshingly honest as it provides facts which do not support his position but which allow the Court to resolve this complicated issue.

[27] In an unrelated instance, Mr. Spencer testified at trial that he believed he made a mistake in his deposition testimony regarding one payment and the month it was tendered. He corrected that perceived mistake at trial. That testimony is not what the Court is referring to, and the Court has not considered that possible error. Mr. Spencer's deposition testimony and the affidavit testimony he gave in support of the defendant's motion for summary judgment are separate items.

32

10. The **June 2011** payment under the Note was paid on or about by [sic] June 30, 2011, by GQ, LLC. ... I do not have the original of this check, as it **was deposited** by me upon receipt.

11. The **July 2011** payment under the Note was paid on August 10, 2011. ... I do not have the original of this check, as it **was deposited** by me upon receipt.[28]

12. The **August 2011** payment under the Note **was tendered** by GQ, LLC to CBS on or about **August 25, 2011**, but said payment was not accepted by CBS because it was late under the terms of the Note.

13. The **September 2011** payment under the Note **was never tendered** to CBS.

14. The **October 2011** payment under the Note **was tendered** by GQ, LLC to CBS on or about **October 29, 2011**, but said payment was not accepted by CBS because it was late under the terms of the Note.

15. The **November 2011** payment under the Note **was tendered** by GQ, LLC to CBS on or about **November 30, 2011**, but said payment was not accepted by CBS because it was late under the terms of the Note.

Exhibit "A" (A.P. Docket No. 60) to <u>Defendant's Motion for Partial Summary Judgment</u> (A.P. Docket No. 59) (emphasis added).

### (ii) The September 2011 Payment

In regard to the September 2011 payment, based on the testimony of Mr. Gomez and Ms. McCulley, and the pattern of which all other payments were made, the Court must find that this one payment also was tendered timely. It was dated September 27, 2011. While the defendant did not offer it as an exhibit (supporting its position) a copy was offered as Plaintiff's Exhibit 13. The confusion about this one check may lie in the fact that, as both Mr. Gomez and Ms. McCulley testified, after Mr. Spencer refused the August 2011 payment, Ms. McCulley held both that check with the September 2011 payment hoping Mr. Spencer would accept both at the same time.

---

[28] As stated above, the Court agrees that waiver of a prior default is not waiver of future default; however, waiver here is not the issue as to the payments for August, September, October, and November. The issue is whether there was default and as explained above, this Court finds that there was none.

### (iii)  The December 2011 through April 2012 Prepetition Payments

In regard to prepetition payments from December 2011 through April 2012, when the pending Chapter 11 petition was filed, the problems caused by the parties real estate instruments and the parties disagreements had reached an insurmountable point. At trial, Mr. Spencer explained. When asked by his attorney why he did not accept certain checks, he answered that at that point his patience had run out.

As this Court found above, the mortgage payments were not, for the purposes of the default provisions of the note (whatever those provisions meant) due on the first of the month, but were, for purposes of default, due within thirty days of the first of the month. While it appears from Mr. Spencer's trial testimony that some of the checks were present to him after that 30-day period, the totality of the evidence is that all payments were either made or tendered timely or if not, accepted later. For purposes of a mortgage default, any contrary evidence is simply not sufficient for the Court to find differently.

In contrast, notwithstanding this Court's opinion that the payments were due within the 30 days after the first before default, the Court must find that the defendant's position that the payments were due on the first of each month was, on its face, a reasonable one. The fact that this Court disagrees with that position does not mean that the defendant's repeated refusal to accept payments was wrong. It just means that the parties were at a stalemate. Mr. Spencer stated that his patience had run out. Therefore, the Court must ask, what was the plaintiff to do? In that regard, the Court must find that the plaintiff's failure to make prepetition payments for December 2011 through April 2012 is not actionable.[29] To find that the plaintiff was at the time, and remains so, in jeopardy of something as serious as a debt acceleration and eventual foreclosure based on the evidence presented would be exceedingly unreasonable.

### (iv) Conclusions to Prepetition Payments

Therefore, because the Court finds that there was no default in making any prepetition mortgage payment from April 2011 through April 2012, the provisions in the note regarding acceleration and foreclosure do not, at least as to those payments, apply. Consequently, the Court finds that: (1) the plaintiff was not in default in making any prepetition mortgage payments; (2) the foreclosure that was attempted should have been, as the state court concluded, stopped; and (3) there are no ongoing facts relating to prepetition mortgage payments that support a current foreclosure attempt.

---

[29] There is no issue as to whether the plaintiff defaulted by not making these four payments. The parties' relationship at this time was irreparable. As explained, the defendant was not going to accept any payments under any condition. It would be unconscionable for the Court to punish the plaintiff at this time based on that scenario.

### (2)  Postpetition Mortgage Payments

As stated above, the parties agree that all pre-balloon, postpetition mortgage payments have been made timely.[30] But as the Court noted above, that agreement is not supported by the debtor's monthly operating reports. As the Court stated, it will rely on the parties to resolve this issue; however, as the issue relates to the pending Verified Complaint, the Court finds that consideration of postpetition payments is not relevant except if there are payments that are still due. The final question then is what prepetition mortgage payments are still due.

### (3) What Prepetition Mortgage Payments Are Still Due?

Fortunately, the answer to this question is far simpler than the others. The parties agree that the April 2011, May 2011, June 2011, and July 2011 payments were accepted and deposited by the defendant. The parties agree that the August 2011, September 2011, October 2011, and November 2011 payments were not accepted and are still due.  Consequently, the Court finds that there are four payments at $9,989.72 each still due and unpaid.

In addition, for the reasons the Court explains above, the plaintiff also did not make payments for December 2011 through March 2012. Therefore, there are these additional four payments, also at $9,989.72 each still due and unpaid.

All toll, there are eight prepetition mortgage payments at $9,989.72 that must be made. In a related question, most likely through the defendant's Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing, the defendant argues that interest must be paid on these payments. This Court disagrees. All of the payments were at a minimum tendered when due or there is reason to excuse them if they were not. Therefore, the Court finds that no interest is due on any unpaid prepetition mortgage payment.

Similarly, the defendant argues that it is entitled to attorney fees for the collection of these payments. For the same reason, the Court finds that none should be allowed; however, the Court must admit, it does not have any suggestion of how to separate the time and expenses spent on collection of "missed" mortgage payments from any of the other issues here where attorney fees may be appropriate.

---

[30] The balloon payment referred to in Paragraph 3B of the Real Estate Mortgage Note was due on April 1, 2014. It is the subject of the plaintiff's pending Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing. A.P. Docket No. 166.

35

### b. Insurance

Although not plead in Count One of the state court <u>Verified Complaint</u> or associated pleadings, the parties clearly joined the issue at trial of whether the plaintiff provided insurance on the subject property as required by the parties' contracts, and, if it did or not, whether that failure allowed the defendant to accelerate the mortgage payments and proceed toward foreclosure.[31]

It is clear that the plaintiff failed to make three insurance premium payments and is still obligated for those payments. What is not clear is whether that failure was a default under the parties' mortgage which allowed the defendant to accelerate payments and begin the foreclosure process.

Legally, the mortgage appears to delay the defendant from starting the foreclosure process for the insurance premiums it paid in the plaintiff's stead until at least April 1, 2014. The parties' mortgage reads:

> Upon condition, however, that if the said Mortgagors pay said indebtedness, and the interest thereon <u>and reimburses said Mortgagee or assigns for any amounts Mortgagee may have expended for taxes, assessments, and **insurance**</u>, and interest thereon, then this conveyance to be null and void; <u>but should default be made in the payment of any sum expended by the said Mortgagee</u> or assigns, or should said indebtedness hereby secured, or any part thereof, or the interest thereon, <u>remain unpaid **at maturity**</u>, or should the interest of said Mortgagee or assigns in said property become endangered by reason of the enforcement of any prior lien or encumbrance thereon, so as to endanger the debt hereby secured, then in any one of said events, the whole of said indebtedness hereby secured shall at once become due and payable, and <u>this mortgage be subject to foreclosure</u>....

<u>Id</u>. (emphasis added).

But as explained above, it is not necessary for this Court to answer that question. The state court did that when it stopped the foreclosure and the defendant then failed to properly advertise the foreclosure. Therefore there is no ongoing foreclosure and any attempt to continue one would require the defendant to begin again. In contrast, because the April 1, 2014, date has passed, in regard to the plaintiff's default in making

---

[31] Count One relates to mortgage <u>payments</u> only, but the parties included the question of insurance under this umbrella and by consent presented that question at trial. Under Rule 15(b)(2) of the Federal Rules of Civil Procedure, (applicable to this proceeding pursuant to Rule 7015 of the Federal Rules of Bankruptcy Procedure) this Court may conform the pleadings to the evidence presented at trial as an issue tried by consent.

Case 12-70018-BGC    Doc 123    Filed 05/20/14    Entered 05/20/14 15:47:21    Desc Main
Document    Page 36 of 40

insurance premium payments for which the defendant paid and was not reimbursed, technically the defendant may have acquired the right to start the foreclosure process.[32] However, that right may be subject to the plaintiff's <u>Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing</u> filed on March 27, 2014. The question then becomes: Did making the offer imbedded in that motion void the defendant's newly acquired right to foreclose? The Court hopes it will not be necessary to answer that question.

But in any event, the plaintiff is still obligated for the three unpaid insurance premiums, and the Court cannot find any reason why the defendant would not be entitled to interest on those payments. Whether the defendant is entitled to attorney fees in attempting to collect those payments is a much more difficult question. Did the defendant's right to pursue collection arise only on April 1, 2014? Again, the Court hopes it will not be necessary to answer that question either.

### 2. Count Three

### a. The Primary Easement Dispute

The Court's factual conclusion that all of the plaintiff's easements are located together along the three-phase power line the plaintiff installed is required by Alabama law. The general rule in Alabama is that:

> a **contract for the sale of real property** merges into the deed given in fulfilment of that contract:
>
> " '[O]rdinarily, <u>in the absence of fraud</u> or mistake, when a contract to convey *257 has been consummated by the execution and delivery of the deed, the contract becomes functus officio, and the deed becomes the sole memorial and expositor of the agreement between the parties, and upon it thereafter the rights of the parties rest exclusively....' "
>
> <u>Jones v. Dearman</u>, 508 So.2d 707, 709 (Ala.1987) (quoting <u>Alger–Sullivan Lumber Co. v. Union Trust Co.</u>, 207 Ala. 138, 142, 92 So. 254, 257 (1922) (emphasis added)).

<u>Teer v. Johnston</u>, 60 So.3d 253, 256-57 (Ala. 2010) (emphasis added).

---

[32] One of the plaintiff's declaratory judgment requests was for the Court to determine whether a foreclosure triggering event still exists. As the Court explained above, there may be one now that the April 1, 2014 maturity date has been reached; however, the Court cannot find one for any prior acts.

The parties' Purchase Agreement gave the plaintiff time to locate their utilities and build an access road. Operating under that agreement, the plaintiff installed their three-phase power line. This Court, based on Mr. Fair's testimony, found that when the Warranty Deed was executed and referred to the "existing power line," that the line it was referring to was the plaintiff's three-phase line. That was the location Mr. Fair and Mr. Gomez walked. That was the location Mr. Gomez described as, "I got this for my utilities and my road." And this is the only location that supports a factually reasonable and common sense conclusion. What other power line would this Warranty Deed refer to, knowing that an easement had already been established for the three-phase line?[33] That was the location of the power line easement.[34] Therefore, under the Warranty Deed and Alabama law, that also has to be the location of the water line easement and the access road. If there is not enough space to construct both at that location, the debtor created its own problem. The defendant was not at fault.[35]

Therefore, under Alabama law, the parties' Purchase Agreement <u>was</u> the "contract for the sale of real property. When the Warranty Deed was executed, all of the terms of the Purchase Agreement merged into that Deed. Consequently, the deed controls.

### b. The Secondary Easement Dispute

If the defendant contends that it has an easement on, or any other property right in, the "slag road" that runs along Mr. Spencer's property, the Warranty Deed proves that it does not. As Mr. Spencer testified, at all times he specifically excluded that road from any conveyance because he had had a similar problem in the past. Consequently, the deed he gave the defendant excluded any interest in his "slag road."

### 3. Count Five (as it relates to Count One)

Count Five request damages. There is no evidence to support the conclusion that the defendant is responsible for any damages to the plaintiff. As such, the <u>Motion</u>

---

[33] Further support comes from Mr. Spencer's testimony that because he still owned the property and no easement had been conveyed to the Plaintiff at the time it was necessary to install the three-phase line, he granted the power company the easement necessary to install that line at this location. It is no coincidence that the deed Mr. Spencer later executed in favor of the plaintiff identified that power line as a reference point.

[34] Again, the Court acknowledges that Mr. Spencer, not the plaintiff, gave the power company the easement to install that line as the parties were still operating under the Purchase Agreement at that time, and the property purchase was still pending.

[35] Mr. Spencer testified that he was fine with them moving the road to the right or left of the line to give them enough space to construct it.

<u>for Directed Verdict</u> made by the defendant at trial is due to be granted.[36]

## IV. Maturity - April 1, 2014

The current status of the parties' relationship is this:

1. All mortgage payments were due within 30 days of the first of each month and could not be in default unless tendered outside that time. All mortgage payments were in fact made or tendered timely, but if not, they were accepted and any associated default was waived. Because all mortgage payments were timely, the defendant is not entitled to interest on any of those payments or attorney fees for attempting to collect them. Similarly, because the plaintiff was not in default in making any mortgage payments, the foreclosure that was attempted should have been stopped, and was by the state court for other reasons. And finally, because the plaintiff was not in default in making any mortgage payments, there are no ongoing facts to support a current foreclosure attempt. In contrast, whatever mortgage payments the plaintiff has not paid are still due, and the plaintiff is still obligated to pay them.

2. The plaintiff failed to make three insurance payments for which the defendant had to pay. The plaintiff is still obligated to reimburse the defendant for those payments, with interest. In contrast, the Court has not ruled on whether the defendant is entitled to attorney fees for attempting to collect those payments as the Court cannot find that the plaintiff was in default at the time it did not make the payments due to the parties' mortgage delaying that default until April 1, 2014. On the other hand, now that date has passed and the plaintiff has not reimbursed the defendant for the payments the defendant made, technically the plaintiff could be in default and the defendant would have the right to begin the foreclosure process. However, that right would be impacted by the plaintiff's filing of its <u>Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing</u> and when the plaintiff actually reimburses the defendant. Notwithstanding these conclusions, whatever insurance premium payments the plaintiff has not paid are still due and the plaintiff is still obligated to pay them, with interest.

---

[36] As the Court discusses above, the defendant's position that payments were due on the first of each month was not unreasonable, just one with which the Court disagrees. Similarly, the Court notes that there is no evidence that the defendant turned off the water to the plaintiff for any reason other than a reasonable one. Finally, there is no evidence that the defendant blocked the plaintiff's gate access to its property for any reason other than a reasonable one. Consequently, the plaintiff did not prove that the defendant owed it any damages.

39

3.      The plaintiff's easements for its utilities and access road are, as conveyed in the Warranty Deed, and found by this Court, to be 25 feet on either side of the plaintiff's three-phase power line. The defendant does not have any easement, or other property interest in, the "slag road" that runs along Mr. Spencer's property.

4.      The April 1, 2014, balloon note is now due along with whatever other debts the plaintiff owes the defendant.

## V.  The Parties' Obligations to the Court

The parties shall confer and, within 30 days from the date of this <u>Order</u>, submit an agreed upon statement to the Court containing the following:

1.      The amount the parties agree the plaintiff must pay to cure all arrears it owes the defendant;

2.      The status of the plaintiff's utilities;

3.      A plan, with starting and completion dates, for the plaintiff to construct its own road within the defined easement, or near it if the defendant consents;

4.      A proposed order on the plaintiff's <u>Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364 and for Expedited Hearing</u>. and the defendant's <u>Objection to Debtor's Motion for Authority to Borrow on a Secured Basis Pursuant to 11 U.S.C. § 364</u>.

If the parties cannot agree, or if such a statement is not submitted timely, all matters will be set for a status conference at the Court's convenience.

An Order will be entered contemporaneously with this Memorandum Opinion.

Dated: May 20, 2014                         /s/Benjamin Cohen_____
                                            BENJAMIN COHEN
                                            United States Bankruptcy Judge

BC:pb